OPINION OF THE COURT
Patricia E. Gallaher, J.
Before the court is the interesting issue of whether this is a relocation case, governed by the Tropea factors, when brought approximately seven months after the mother moved five hours away with the child. The relevant stipulated order, giving 50/50 shared residency, had not determined who had primary physical residence but identified the father’s residence as controlling for educational purposes. There was no express stipulation against moving out of the county with the child.
If it is not a relocation case, the key issue is who should have primary physical residence when the mother has left the father, taking the child to live with her parents in Monroe County, while the father has remained in Saratoga County. Also at issue is whether the mother should have a permanent order of protection against the father.
Summary of Holdings
At trial, the mother’s testimony was credible and the father’s was not when it conflicted with the mother’s testimony. The *581 mother’s stepfather and mother were also credible witness. Though this was previously a joint custody case, after all the litigation, it no longer is. (E.g. Matter of Hill v La Paglia, 306 AD2d 909 [4th Dept 2003].)
For the reasons set forth below, this court finds that this case is not a relocation case governed by the so-called Tropea factors, such as economic necessity, and further that the best interests of Lillian require that sole custody and primary physical residence be awarded to the mother, who shall be allowed to continue to reside in Monroe County. This decision is supported by the Attorney for the Child. Furthermore, the father’s enforcement petition is dismissed in the interests of justice, and the mother is granted a one-year final order of protection.
Key Facts Regarding Whether This is a Relocation Case
The key question to be resolved on the issue of whether this is a relocation case is whether the father waited too long to file a petition after the mother had moved. In this regard, the relevant facts are as follows. In May of 2009 the parties entered into a stipulated order in Saratoga County for 50/50 shared custody of their child, Lillian (born in 2005). At that time both Anthony C. (father) and Samantha M. (mother) lived in Sara-toga County and had resided together there. The parties reconciled in early 2010 and, for approximately 20 months after reconciling, the parties lived together without modifying the 50/50 order. They lived with their child Lillian and the father’s teenage son, and with frequent visits by the father’s other two children. In September 2011 they split up again, after a physical incident between the father’s teenage son and the mother, which it is agreed included the mother threatening the son with a sharp object, which led to the father telling the mother “she no longer had rights to his children.” By that he testified he meant, for example, she could not tell the kids to go to their rooms if they were “acting up” as she had before. The reason the mother moved out, as quoted by the father’s attorney in her brief, was as follows: “His eldest son and I had a disagreement and T. had told me I no longer had rights to his children. And if I didn’t like it, I needed to pack and get out.” She chose to move out, and a few weeks later she took Lilly with her to live with her parents in the Rochester area.
Mother testified the father consented to her moving, without conditions, and helped her pack for the move. Even the father testified he “allowed” her to move, but said it was only *582 temporary permission, and he claims the mother agreed to come back in six months — and had represented to him that she was going to get a job which would lead to a job back in Saratoga County in six months. The mother disputes that there was a temporary agreement, and disputes that she agreed to come back in six months. The father testified he knew someone who had done something similar and knew that the mother’s stepfather worked for the county. While the father argues he believes that the mother was going to get some six-month county job through her stepfather and use that to transfer back to Sara-toga County, this did not happen, and the mother and stepfather deny that it was the plan. It is indeed a somewhat incredible claim on its face. The mother’s stepfather testified it was not even a possibility, given the mother’s lack of qualifications.
The father started this litigation more than six months after the mother had moved with the child to Monroe County to live with her mother and stepfather and argues the mother’s alleged promise to come back to Saratoga County justifies his failure to file his enforcement petition regarding her move for some seven months. The father’s enforcement petition[1] was filed in Sara-toga County on April 24, 2012, alleging that the move violated his 50/50 parenting time provided by the May 2009 order, and that he was duped by the mother into thinking she was only moving temporarily to Monroe County to get a job which would lead to a job back in Saratoga County. The mother thereafter, on June 20, 2012, filed her petitions for modification of the prior custody order in Monroe County and for an order of protection.[2] The father argues the modification petition was actually a petition for permission to relocate to Monroe County. The enforcement petition was transferred to Monroe County, by the Saratoga County Family Court Judge, without consultation with this court, to be heard with the mother’s modification petition. By the time the father filed his petition, the mother and child were well established in the Monroe County area, and as indicated above, there was no express provision in the parties’ order prohibiting relocation without a court order or written agreement.
*583 Analysis: Is This a Relocation Case?
It is the father’s position that this case is really a relocation case, governed by the Tropea factors (Matter of Tropea v Tropea, 87 NY2d 727 [1996]).[3] The mother disagrees, and the Attorney for the Child appears to disagree as well. This raises the question of what exactly is a relocation case? There does not appear to be any case law actually defining a relocation case. Does it include a modification case, brought in a matter in which there is no actual provision against relocation out of a county but for which relocation would make the ordered visitation impracticable? Perhaps. Does it include this enforcement/ modification case brought some seven months after an actual relocation of a parent and child? This court would answer a resounding “no” because of the passage of time. The principle of loches would seem to apply. Does it matter if the father says the mother lied to him about her intention to return, causing him to delay filing a petition to enforce his rights? Again this court would say “no,” as there is no basis for trust or control in such situations.
Tropea v Tropea, the leading New York relocation case, involved two custodial parents’ separate petitions to relocate with children away from the area where they and the other parent had lived, thus affecting future visitation if relocation were granted. The parents seeking to move sought judicial approval in advance of any move and had orders barring relocation without judicial approval. One required a court order if the parent wanted to move from Onondaga County and the other if the custodial parent intended to move more than 35 miles from the other parent’s residence. For example, as stated in Matter of Hirtz v Hirtz (108 AD3d 712, 713 [2d Dept 2013]), “When reviewing a custodial parent’s request to relocate, the court’s primary focus must be on the best interests of the child” (citations omitted and emphasis added). Furthermore, relocation de *584 cisions are written in terms such as, “[w]hen evaluating whether a proposed move is in the child’s best interest” (id.) or “we find that the mother established that the children’s best interests would be served by permitting the relocation, which will, among other things, still permit the children to have a meaningful relationship with the father.” (Matter of Said v Said, 61 AD3d 879, 881 [2d Dept 2009].)
It is this court’s experience with relocation cases which are unquestionably relocation cases that as soon as one party even gets a hint that the other might take the child and leave the area, or the parent actually leaves with the child, a petition opposing relocation is promptly and routinely filed. Usually filing is by order to show cause seeking an ex parte order immediately restraining the other party from leaving the area with the child or demanding the immediate return of the child to the area. (See e.g. Matter of Tekeste B.-M. v Zeineba H., 37 AD3d 1152 [4th Dept 2007].) Such orders are routinely granted to preserve the status quo. Furthermore, a parent wanting to move, and governed by a clause in an order requiring court permission or a signed agreement before moving a child permanently out of the area, will file a petition seeking permission to relocate— before relocating. Every now and then a parent will even file to relocate, and personally relocate, but leave the child behind with the non-moving parent — and hope to prove the case in the not too distant future. All these cases fit easily within the definition of relocation cases. Accordingly, what can be concluded clearly is that it would be wise to bring any case which is arguably a relocation case — whether for or against relocation — as soon as the issue arguably arises. That was not done here — and as a consequence, this court concludes this case was not a relocation case at the time it was belatedly filed, even if it might have been a relocation case if filed immediately upon the mother’s move.
When a party does what the father did here, i.e., not file for seven months to stop a move or immediately pull it back, the facts change. The center of gravity of the evidence moves. As indicated by the Saratoga County Judge’s transfer order, that judge obviously thought the place for trial of the custody issues had become Monroe County. Chances are good that if the father had filed immediately upon learning of the mother’s move or intended move, the transfer order would not have been granted. Indeed, a comparison can be drawn to the Uniform Child Custody Jurisdiction and Enforcement Act’s definition of “home *585 state.” A “home state” is where a child has lived with a parent (or person acting as a parent) for at least six consecutive months immediately before the commencement of a child custody proceeding (Domestic Relations Law § 75-a [7]). Thus, if this mother had taken the child out of New York State, and the father had not filed regarding custody for six months, jurisdiction would rest in the new state. Similarly, after six months, venue would seem to rest in the new county, and the point at which the matter was a relocation case — in which a parent normally seeks permission to relocate with a child — would have surely passed. Therefore, without saying how quickly a parent opposing a move of a child from the county must file, it certainly can be concluded that filing more than six months after a move — as here — is too late to start a relocation case. At that point, an enforcement case and a custody modification case are simply that, not a relocation case judged by the Tropea factors.
The conclusion is unavoidable that at some perhaps hard-to-define point, once a party has moved with a child significantly far away from the other parent’s home, a standard relocation case necessarily becomes no longer a relocation case, but simply a custody battle between two parents living in two different places, based on a change of circumstances when there is a prior order. If there is no prior order, it is just an initial custody case. What exactly is the time at which a relocation case transforms into a change of circumstances or initial custody case need not be decided here — as this particular case was so clearly past that point.
In answer to the father’s argument that he was “duped,” this court concludes that argument is irrelevant. When the relationship between parties has fallen apart, to the point that they have stopped living together, there is no longer any rational reason to trust the other person. Nor can one such parent expect to control the other. It is time to rely on the law and the courts and get an order, or get an agreed, written, notarized agreement that can be enforced by the law and the courts. To argue that the other person said that he or she would come back, as the father does here, is simply to make an inexcusable mistake. Obviously, two parties who don’t agree on who should be primary custodian of a child cannot rely on anything but asserting their rights legally. Indeed, one party might well deceive the other. They both may try to deceive the other. One might maintain he or she has the right to control the other, but such a right does not exist. Similarly, there simply is no basis to trust *586 the other parent as that other parent’s interests necessarily conflict with one’s own. To argue in retrospect that one parent trusted the other to return, as the father does in this case, should not be the deciding factor, or even important. A court should not be expected to analyze a love relationship once it has become hostile and try to figure out who lied about what, when and why, so as to determine whether a case is a relocation case, when petitions could have been filed promptly and properly, creating a relocation case.
When one party has relocated without notice or is threatening to do so, it is better to be safe than sorry — file a petition as soon as one party learns the other is threatening to move out of the area or has taken off for another county or state.
In short, while this case could have been a relocation case, due to the passage of time, it is not. At some point, a case is no longer appropriate for relocation case treatment. Permission to relocate need not be granted. Relocation has occurred. What must be determined by the court at such a point is with whom the child will live, based on the child’s best interests.
Key Facts Regarding Best Interests
What is ultimately most important, of course, in a non-relocation custody case, is what is in the child’s best interests— not who was gullible, or whether one spouse should be able to control the other and set the terms of a breakup. Each party’s behaviors can and should be considered, and factored into what is in the child’s best interests.
From May 2009 (the date of the order of shared residency) till the fall of 2009, the parties shared Lillian with a schedule of two days with one parent, two with the other, and alternating weekends. The paternal grandmother provided day care. Starting in the fall, the mother was the primary caretaker as she had lost her job. At that time the father was living in a double-wide trailer in Stillwater, Saratoga County, in the same trailer park as his ex-wife Carrie. Then on days the father worked and he had Lillian pursuant to the order, the mother went to his house and took care of Lillian till the father came home. The mother moved in with the dad’s ex-wife in December 2009, eliminating her commute to take care of Lillian. The mother testified, after that time, the father rarely had Lillian overnight — he mostly came to visit her at Carrie’s trailer. That continued while the child was in preschool in the mornings. While the child was in morning preschool, the mother had a part-time job. The mother *587 went to the father’s home early in the morning and took her to preschool, and picked her up when school was done and brought her to his home, or her home, depending on the schedule. This continued until sometime in the spring of 2010 when the mother moved back in with the father. Thus, this court concludes the mother was in fact the primary caretaker even when the order provided equally shared parenting time.
It was undisputed that when the parties reconciled in or about the spring of 2010, after their shared custody order, and until September 2011, they lived at the father’s trailer home in Still-water. It was also undisputed that, during this time, the mother spent considerable time caring for the father’s three other children, as well as Lillian. The father did volunteer work with the local fire department — two to three times per week for up to three hours at a time during this period, in addition to holding down his job. It was undisputed that both parents have extensive family in Saratoga County and Lillian has a close relationship with the paternal grandmother there, as well as with her half-siblings. It is also undisputed that the mother had minimal jobs in Saratoga County, which would not have provided her enough income to support herself, and that she now has a stable job in Monroe County and lives with her mother and stepfather in a stable, loving home. Indeed, as a high school but not college graduate in Saratoga County, she was making $9.50 per hour gross, working part time and taking home less than $100 per week. She had no particular job skills which would earn her a higher wage. She left her work in Sara-toga County to move to Monroe County, where she was soon able to find work. At the time of trial she earned $10.50 per hour while living with her mother and stepfather, worked a 40-hour week, and took home about $293 per week. Further, she received financial assistance from her mother and stepfather, and did things like housework and caring for their dogs in exchange for the financial support. She paid about $75 per month on average for rent — allowing her to have a better standard of living than paying market level rent (or living with someone she did not want to live with).
While Lillian and her mother live in the basement of the parent’s home and it was not initially up to code for bedrooms, it was quickly brought up to code when the code issues were discovered. The family did fire drills. There was no safety issue with the home at the time of trial. It was certainly at least as nice as the father’s trailer home.
*588 Analysis: What is in the Child’s Best Interests?
In this matter, the father seeks to enforce his 50/50 time with the child under the prior order while the mother seeks a modification of a prior order as 50/50 no longer works. Since this is not a relocation case, she must of course establish a change of circumstances sufficient to warrant an inquiry into whether the best interests of the child warranted a change in custody. (Matter of Cole v Nofri, 107 AD3d 1510 [4th Dept 2013].) There has really been no dispute in the case at bar that a change of circumstances occurred since the prior order. The parties had moved back in together since their prior order, then separated, and moved far apart so that the sharing schedule would no longer work. Thus, the mother has established a suf- ■ ficient change of circumstances. (Cf. Matter of Maher v Maher, 1 AD3d 987 [4th Dept 2003].) No one factor, including the existence of an earlier order, is determinative of whether there should be a change in custody (e.g. Friederwitzer v Friederwitzer, 55 NY2d 89, 93 [1982]; Conway v Gartmond, 108 AD3d 667 [2d Dept 2013]). Very importantly, it was clear from the testimony that the mother was the primary caretaker of Lillian while they were separated and while the parties lived together after they reconciled — and generally courts leave children with a parent when they have been doing well with that parent (see Conway, Matter of Roefs v Roefs, 101 AD3d 1185 [3d Dept 2012]; Matter of Ross v Ross, 96 AD3d 856, 857-858 [2d Dept 2012]; Matter of Chery v Richardson, 88 AD3d 788, 789 [2d Dept 2011]; Matter of Fallarino v Ayala, 41 AD3d 714 [2d Dept 2007]; Verity v Verity, 107 AD2d 1082 [4th Dept 1985], affd 65 NY2d 1002 [1985]; cf. Matter of Stephen R.H. v Lisa A.H., 41 AD3d 1310 [4th Dept 2007] [where violence in the mother’s home inflicted on her and the children by her live-in boyfriend justified a change of custody to the father]). Indeed, the father, as demonstrated by his testimony, was not particularly aware of many of the details of Lillian’s life. Since the mother has lived in Rochester, she has continued to be the child’s primary caretaker, and she has made sure that the needs of the child are well met— including a new pediatrician and dentist, plus appropriate child care providers, and even gymnastic lessons. Furthermore, there have been regular visits to the father in Saratoga County, generally every other weekend, as set up between the two parents, with the mother and her family providing much of the transportation. Indeed, the stepfather kept very clear records regarding visits, organized on a computer and supported by E-ZPass rec *589 ords. The visits appear to have been happy events — except for one problem with the exchange created by the father behaving angrily in front of everyone, and trying to lunge into the mother’s car, perhaps to take the keys from the ignition, while Lillian was in the backseat.
There has been other unpleasantness since the mother moved to Rochester. For a while the father did not return the child’s clothes at the end of visitation, though that is no longer a problem. He sent her harassing messages because she was seeing another man. At one point, the mother obtained an order of protection against the father as a direct result of a visitation exchange issue, and also arising from the father’s belligerent, reckless, negative reaction to the mother dating (which she had a right to do), the father’s anger at being taken off her Face-book account (which she had a right to do), and his further objection to being blocked from certain — but not all — phone communication options after she received harassing messages from him (which she had a right to do). It is clear from the testimony that the father always had perfectly adequate phone access to Lillian’s home, and there is no requirement that any parent be allowed to call any and every phone another parent may use.
This father had a pattern of overestimating his rights and not understanding the mother had rights. The father’s reaction to conflict between the mother and the teenage son helped create an untenable situation for the mother as a stepparent figure— when he said she had no rights to his children. Perhaps this is not easily understood by a biological parent. Being a stepparent/ stepparent figure is difficult enough, and without reasonable support from the biological parent, it can make a decent home life impossible for the stepparent figure, particularly as stepchildren get older and perhaps even bigger and stronger than a stepparent. Often stepsons do grow bigger and/or stronger than their stepmothers, and this creates a situation where a stepmother can be physically intimidated by a stepson. That may well have been the situation between the mother and the father’s son, or it may have been the likely future reality she anticipated. She had a right to take her child with her when she moved out — but that came with the reality that a court might determine the father should have the child instead. She had a right to choose her own place to live when she moved out. She had a right to choose who to associate with when she moved out. Had the father been in her position, he would, of course, have had these same rights.
*590 Similarly the court finds that the father believes he should be able to control all sorts of things that are not his to control. The mother testified credibly that the father said “it was not allowed” that Lillian could be around other men. Furthermore, she testified the father said it would “ruin her” if she was around other people of either sex, introduced to her by the mother. There was credible testimony that when Lillian asked her father to be allowed to stay home with the mother because she was too sick, he demanded a doctor’s note, a photo of her at the office and a doctor’s bill. Almost amazingly, the mother sent that to him. Then, according to the mother, he accused the mother of injecting Lillian with something to make her sick. He used money to control the mother according to the credible testimony. For example, he would not give her money to actually shop for groceries and clothes for the household. Instead, she had to make him go shopping with her and then he would pay for the purchases. Further, he did not pay any cash child support when the parties were separated previously, though he did pay some bills. He only pays child support now pursuant to a court order. These facts simply show bad judgment over and over by the father.
A choice as to a child’s primary physical residence has to be made in such cases as this where the parties no longer live together. While this mother in the past had gone so far as to live with the father’s ex-wife who lived very close to the father, thus keeping Lillian very close to the father, living with a man’s ex-wife is certainly an extreme and unusual situation. It cannot be expected or demanded or ordered. However, it demonstrates that this mother really did try to work with the father for Lillian’s sake — as well as that she cannot support herself and was forced to live off others, even unlikely others. The father pulled the rug out from under the mother by his way of resolving the issue between the mother and his son. Perhaps it was only the final straw in a relationship going bad. No one can ever know exactly all the causes and effects of two people breaking up. But it is certain that one adult cannot dictate to another where he or she must live.[4]
This custody decision is relatively easy. Primary physical residence must be determined based on the best interests of the *591 child. (Eschbach v Eschbach, 56 NY2d 167 [1982]; Matter of Nehra v Uhlar, 43 NY2d 242 [1977].) The status quo is working. Stability is an important factor to be considered (see e.g. Eschbach at 171). As stated in Fox v Fox (177 AD2d 209, 210 [4th Dept 1992]),
“Among the factors or circumstances to be considered in ascertaining the child’s best interests are: (1) the continuity and stability of the existing custodial arrangement, including the relative fitness of the parents and the length of time the present custodial arrangement has continued; (2) quality of the child’s home environment and that of the parent seeking custody; (3) the ability of each parent to provide for the child’s emotional and intellectual development; (4) the financial status and ability of each parent to provide for the child; (5) the individual needs and expressed desires of the child; and (6) the need of the child to live with siblings” (citations omitted).
Clearly in this case the best interests of the child demand that the mother be awarded primary physical residence and that she be allowed to live in the Rochester area. The mother has been the primary caretaker since May of 2009 while the parties were separated, while they lived together, and since they separated again. The mother made a commonsense and appropriate decision to go live with her mother and stepfather, taking her child. She had to move, as she recognized it was not reasonable to continue living with the father under his terms. The mother’s mother and stepfather came across as very good and decent people, who care very much for Lillian and the mother. Lillian’s life is good. The child is in a fine, small home with three adults to love her and take care of her on a daily basis. She has her own room. The evidence shows Lillian is doing well in school, and has friends at school and in the neighborhood. It is clear that the mother made a safe, practical, comfortable and traditional decision when she came to live with her mother and stepfather. There is no reason to upset the status quo by forcing the mother to return to Saratoga County, where she would have to live off someone less appropriate than her own mother and stepfather, or get an unusually high-paying job for someone with her skills and work history, in order to continue having Lillian live with her.
It is clear that the father exaggerated his involvement with Lillian regarding daily caretaking, but he is good at having fun *592 visitation. As noted by the Attorney for the Child, the number of relatives in Saratoga County ensure that Lillian can maintain a strong and quite natural connection with her father, half-siblings and others. Accordingly, the father’s petition for enforcement is dismissed, and the alternate weekend visits for the father with Lillian shall continue, with the exchanges of the child continuing to be at Verona, Fridays at 6:30 p.m. and Sundays at 6:30 p.m., unless otherwise agreed in writing.
Order Herein and Order of Protection
Finally, the mother’s petition for a final order of protection is granted, for a period of one year from the date hereof, on the same terms as the temporary order of protection, as the mother’s testimony was credible on the issues raised in the petition.
For the reasons set forth above, it is hereby ordered that the mother’s petition is granted and she is hereby granted sole custody and primary physical residence of the child Lillian, and the father is hereby granted alternate weekend visits, with the exchanges of the child continuing to be at Verona, Fridays at 6:30 p.m. and Sundays at 6:30 p.m., unless otherwise agreed in writing, plus such other visitation as the parties may from time to time agree; and it is further ordered that the father’s rights to apply for an order regarding holiday, summer and other special days is reserved and shall not require a change of circumstances; and it is further ordered that the father’s enforcement petition is dismissed with prejudice; and it is further ordered that the mother is granted a separate final order of protection consistent herewith, to be entered in docket 0-06780-12.

. The June 26, 2012 transfer order referred to the petition as a violation petition but it is actually an enforcement petition.

. She also filed a child support petition, not heard by this court.

. These factors include but are certainly not limited to each parent’s reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child’s future contact with the noncustodial parent, the degree to which the custodial parent’s and child’s lives may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements. In the end, it is for the court to determine, based on all of the proof, whether it has been established by a preponderance of the evidence that a proposed relocation would serve the child’s best interests.

. As stated in Friederwitzer (55 NY2d at 94, citing Matter of Nehra v Uhlar, 43 NY2d 242, 250-251 [1977]), “even [abduction of a child] must, when necessary, be submerged to the paramount concern in all custody matters: the best interest of the child” (internal quotation marks omitted).